# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 31 2020, 11:22 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

David W. Stone IV
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of Parental Rights of M.C., Mother, N.J., Father, and Z.J., Child,

M.C.,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

August 31, 2020

Court of Appeals Case No.
20A-JT-399

Appeal from the
Madison Circuit Court

The Honorable
G. George Pancol, Judge

Trial Court Cause No.
48C02-1910-JT-260

**Kirsch, Judge.**

[1]     MC. ("Mother") appeals the juvenile court's order terminating her parental rights to her minor child, Z.J. ("Child").[1]  Mother raises the following restated issue on appeal:

> I.      Whether the court erred in making several of its findings; and
>
> II.     Whether the juvenile court's judgment terminating Mother's parental rights was supported by clear and convincing evidence.

[2]     We affirm.

## Facts and Procedural History

[3]     Mother and N.J. ("Father") (together, "Parents") are the biological parents of Child.  *Appellant's App. Vol. II* at 6.  On July 3, 2017, Child was born positive for THC, and medical personnel observed that he was experiencing drug withdrawal symptoms.  *Ex. Vol.* at 3; *Tr.* at 14.  At that time, Child presented with tremors, vomiting, and stiff joints.  *Appellant's App. Vol. II* at 33.  On July 6 and 13, 2017, both Mother and Father tested positive for THC.  *Id.*  However, Child was not removed from Parents' home at this point.  *Id.*

---

[1] The juvenile court also terminated Father's parental rights in the same order.  Although Father does not join in Mother's appeal, he later filed an appeal on the termination order, and we resolve his appeal in a companion case filed with the present case on this date.

[4] On October 11, 2017, Mother had a fight with Father, punching him multiple times in the head and stomach and throwing household items at him, and she threatened to physically harm Child. *Id*. at 34. Law enforcement were called and twice ordered Mother to leave the home and threatened her with arrest if she returned. *Id*. On October 12, 2017, the Indiana Department of Child Services ("DCS") attempted to set up a safety plan with Parents, but Parents continued to argue and were unable to agree on a satisfactory plan. *Id*. When a safety plan could not be agreed upon, Child was removed from the Parents' home and placed in foster care. *Id*.

[5] On October 13, 2017, DCS filed a petition alleging that Child was a child in need of services ("CHINS"), and the juvenile court authorized the petition. *Ex. Vol.* at 42. On the same date, the juvenile court held an initial hearing, advised Parents of the material allegations of the CHINS petition, and appointed separate legal counsel for each of the Parents. *Id*. at 40. On October 18, 2017, Mother admitted that Child was a CHINS, acknowledging "that the child did test positive for THC at the time of birth and services could be beneficial." *Id*. at 38. Both Mother and Father waived a fact-finding hearing, and the juvenile court adjudicated Child to be a CHINS under Indiana Code section 31-34-1-1. *Id*.

[6] On November 15, 2017, the juvenile court held the dispositional hearing and ordered Mother and Father into reunification services. *Id*. at 33-37. Among the general requirements under the dispositional decree, Parents were ordered to obey the law, visit Child on a regular basis, care for Child, maintain adequate

housing and a means of legal income, and abstain from drug use. *Id*. at 34-36. Parents were also ordered to do the following specific requirements: participate in individual counseling and follow all recommendations; participate in family counseling and follow all recommendations; cooperate with home-based services; complete a drug and alcohol assessment and follow all recommendations; submit to random drug screens upon request of DCS; successfully complete parenting classes; attend AA/NA on a regular basis, secure a sponsor, and provide verification of attendance; complete an anger management assessment and follow all recommendations; maintain consistent contact with DCS and inform DCS of any change in address within forty-eight hours; and participate in and successfully complete any recommendations of any domestic violence assessments or programs. *Id*. at 34-37. Mother was also ordered to participate in a batterer's intervention program. *Id*. at 35.

[7] On April 2, 2018, the juvenile court held a review hearing, and found that Mother and Father had not complied with Child's case plan at that time. *Ex. Vol.* at 12. Mother had completed a substance abuse assessment and had been diagnosed with "Cannabis Use Disorder, severe; GAD Generalized Anxiety Disorder and Panic Disorder." *Id*. She was recommended to participate in individual therapy two to four times per month and group therapy. *Id*. Previously, on July 20, 2017, DCS had made a referral for Mother to have a substance abuse assessment and treatment at Aspire, but Mother did not comply at that time. *Id*. Mother started substance abuse treatment in January 2018 at the Bowen Center in Huntington, Indiana. *Id*. Mother attended all of

her sessions in February 2018 but stopped attending her group and individual therapy in March 2018. *Id*. During the time period beginning in September 2017 and continuing to the date of the review hearing, Mother tested positive for THC on all drug screens except for one, and she also tested positive for amphetamine, methamphetamine, cocaine, and "Benzoylecgonine" on several occasions. *Id*. at 12-13. Mother also failed to show up for drug screens on at least twenty-seven occasions. *Id*. at 13. During a team meeting prior to the review hearing, Parents had told DCS that they had been having problems completing their drug screens due to work schedule conflicts, so it was arranged that they could go to a different location; however, they never showed up for their drug screens at that location and could not be reached at the phone number they had provided. *Id*. At the time of the hearing, Parents had begun working with home-based services, but services were suspended in March 2018 due to multiple no-shows by Parents. *Id*. at 14.

[8] Although Mother was ordered to participate in domestic violence intervention services, when DCS brought the services to her, she insisted that she had not been ordered to complete such services, even when DCS reminded Mother that domestic violence was one of the reasons why the CHINS case was opened. *Id*. at 15. Parents continued to refuse to complete domestic violence intervention services, and Mother denied any relationship problems despite several reports from the service providers that Parents had ongoing relationship issues with Mother becoming very angry and violent in front of Child and Father appearing to instigate arguments occasionally. *Id*.

[9] A parenting assessment had not been scheduled at the time of the hearing, even though DCS had recommended an assessment. *Id*. A service provider had observed that Mother played too rough with Child, that Mother was overfeeding Child, and that Parents continued to fight in front of Child, all of which suggested a lack of knowledge of child development. *Id*. It was also found that Parents had failed to maintain contact with DCS and that Parents had been staying in motels and had not notified DCS of their whereabouts. *Id*.

[10] At the time of the review hearing, Parents were not visiting Child regularly. *Id*. at 24. Mother had been provided with approximately thirty-seven opportunities to visit Child since his removal and had only visited him approximately twenty-two times during the reporting period. *Id*. Mother gave various reasons for the missed visitations, including illness, lack of transportation, work, and a tattoo that took too long to get. *Id*.

[11] On September 19, 2018, a permanency hearing was held, at which the juvenile court found that DCS had provided Parents with several reunification services, but they had failed to comply with Child's case plan. *Id*. at 8-9. Supervised visitations had been suspended in April 2018 due to Parents not showing up. *Id*. at 9. Mother had not participated in parenting skills building, had not participated in drug screens or substance abuse treatment since May 2018, had not completed domestic violence programs or psychiatric and medical evaluations, and had not completed home-based casework services. *Id*. At that time, the juvenile court changed the permanency plan to adoption concurrent with reunification. *Id*.

[12]     On March 6, 2019, the juvenile court held another review hearing. *Id*. at 2-5. At that time, services, including supervised visitation, parenting skills building, random drug screens, substance abuse treatment, psychiatric evaluation, medication evaluation, domestic violence intervention, child and family team meetings, home-based case work services, and neuropsychological assessment had been offered to Mother. *Id*. at 2. Mother had stopped participating in or failed to begin most services by April or May 2018. *Id*. The juvenile court found that Mother had not enhanced her parenting abilities and had not cooperated with DCS. *Id*. at 2-3. Mother had stopped visiting Child in April 2018, and eventually, her visitation was cancelled due to "no show[s]." *Id*. at 3.

[13]     On August 28, 2019, the juvenile court held a permanency hearing and changed Child's permanency plan to adoption. *Appellant's App. Vol. II* at 29. The juvenile court noted that the DCS family case manager ("FCM") had reported that Mother had been living in Louisiana since June 2018. *Id*. However, Mother and Father had not participated in services or visited Child since April 2018. *Id*.

[14]     On October 2, 2019, DCS filed its termination petition. *Id*. at 25-27. On November 6, 2019, the juvenile court held the initial hearing, and Mother and Father did not appear because they were living in Louisiana at the time. *Tr*. at 4. The termination fact-finding hearing was held on December 17, 2019, and Mother and Father both appeared telephonically and by counsel. *Id*. at 11. At the hearing, Child's court appointed special advocate ("CASA"), Kelsey Antrim ("CASA Antrim"), issued her CASA report for the termination hearing

and testified at the hearing and incorporated her report. *Appellant's App. Vol. II* at 33-41; *Tr.* at 53-54. DCS requested the juvenile court to take judicial notice of the underlying CHINS case. *Tr.* at 55. Mother's counsel did not object, and Father's counsel said the "only objection I have your Honor is that it would be hearsay (INAUDIBLE)." *Id.* The juvenile court noted Father's objection and took judicial notice of the CHINS case. *Id.*

[15] At the hearing, Mother testified regarding the dispositional order to participate in individual counseling, stating, "I did a few of them" but attributed her lack of compliance to moving. *Id.* at 58. She admitted she "never did [family] counseling" because she first had to complete individual counseling. *Id.* at 59. Mother testified that she lived with her mother for "three or four months" while Mother was still living in Indiana, and her mother would not let other people into the house, so Mother was unable to engage in "home-based work." *Id.* at 61-62. Mother admitted she did not follow-up with recommendations from her substance abuse assessment because she moved shortly after completing the assessment. *Id.* at 62. She did not recall engaging in parenting classes and testified that she did not attend AA/NA, did not secure a sponsor, and did not provide verification of attendance. *Id.* at 62-65. She also testified that she did not recall engaging in a domestic violence assessment. *Id.* at 65.

[16] Kelly Wol ("Wol") is a clinical supervision therapist with the Rollins Center and performed a substance abuse evaluation for Mother. *Id.* at 31-33. Wol referred Mother to individual substance abuse counseling and group counseling, but Mother participated in only four substance abuse individual sessions, and

"no showed" for four sessions. *Id*. at 33, 38. Mother's individual therapy services were closed in December 2018. *Id*. at 38. Wol was also referred to assist in home-based services with Mother but testified that Mother never followed through with those services. *Id*. at 39. During her time working with Wol, Mother took only two drugs screens, both of which tested positive for THC. *Id*. at 40. After six months of "non-involvement," all of Mother's services at Rollins Center were closed out. *Id*.

[17] Mother also worked with an outpatient therapist for substance abuse services. *Id*. at 44. Mother had an assessment on January 19, 2018, and first met with the therapist on January 31, 2018. *Id*. Mother was not consistent with services and cancelled sessions, which caused a disruption in treatment. *Id*. at 45. The last contact between Mother and the therapist was April 26, 2018, and the referral was closed out due to Mother's noncompliance. *Id*. at 46.

[18] FCM Mary Maas ("FCM Maas") started working with Child and Mother on July 2, 2017, the same day Child was born. *Id*. at 13-14. The case began as an informal adjustment due to Child being born drug exposed and Child being removed from Parents' care on October 12, 2017 due to domestic violence in the home. *Id*. at 15. FCM Maas testified that Child was never returned to Parents' care since being removed in October 2017. *Id*.

[19] Mother never showed stability in housing during the CHINS case. *Id*. at 17. From the time the case began in 2017 through June 2018, Mother lived in three or four different locations, including at a motel. *Id*. Mother and Father moved

to Louisiana in June 2018 without informing DCS beforehand. *Id*. Mother had also not shown stability in employment over the duration of the case. *Id*. at 17-18. Mother never showed FCM Maas any employment verification and denied having a job. *Id*. at 18.

[20] FCM Maas testified that Mother's visitation with Child was sporadic with visits stopping and starting and stopping again, due to her non-compliance. *Id*. at 20, 21. Even when people were assigned to drive Mother from Huntington to Anderson for visits, she would not answer the door to engage in visits. *Id*. at 20, 21-22. FCM Maas testified that visitations with Child were eventually cancelled due to this non-compliance. *Id*. at 20.

[21] FCM Maas further testified that Mother and Father continued to engage in domestic violence even in the presence of services providers. *Id*. at 22. Supervised visits had to be stopped "on a couple of occasions" because they were "fighting" and "created a safety hazard." *Id*. FCM Maas testified that Mother never resolved her domestic violence issues. *Id*. at 30. When Mother moved to Louisiana in June 2018, she no longer maintained contact with DCS, and Mother did not provide any further evidence of participating in services. *Id*. at 22.

[22] When Parents relocated to Louisiana, they did not inform DCS of their move. *Id*. at 30. FCM Maas reached out to Mother "at least weekly" while the case was pending, but Mother stopped cooperating with DCS. *Id*. at 23. Due to Mother's lack of participation, FCM Maas believed that continuation of

Mother's parent-child relationship posed a threat to Child's well-being. *Id*. at 24. Mother showed no improvement concerning her domestic violence and substance abuse issues. *Id*. Child was doing well in the foster home where he had been placed since he was four weeks old, and FCM Maas opined that it would be "traumatic for him to be removed from foster care." *Id*. FCM Maas further testified that it was in Child's best interests if Mother's parental rights were terminated because Child needed stability, which Parents had not shown. *Id*. Since moving to Louisiana, Mother rarely reached out to see how Child was, except for a few texts, but no phone calls. *Id*. at 24-25. FCM Maas stated that Mother had shown "no concerns" for Child since moving to Louisiana. *Id*. at 25.

[23] Since being removed from Parents' care, Child had been living in a pre-adoptive foster home. *Id*. FCM Maas testified that Child was thriving in the foster home and was very bonded with the foster parent. *Id*. DCS's plan for Child was adoption, and the foster mother was willing to adopt Child. *Id*. at 25, 53.

[24] CASA Antrim testified that Mother's "inconsistencies and [her] lack for [sic] showing up for [Child] is a detriment to him and as he gets older will continue to be a detriment." *Id*. at 54. CASA Antrim stated in her report that Mother's services and visitation with Child were closed out in April and May 2018 due to "non-compliance and no shows." *Appellant's App. Vol. II* at 35. Although CASA Antrim reached out to Mother, she was never able to speak with Mother because Mother never responded, and the last time CASA Antrim attempted to contact Mother was September 2018. *Id*.; *Tr*. at 54, 55. CASA Antrim testified

that it would be in Child's best interest for Parents' rights to be terminated and for adoption to occur. *Tr*. at 54.

[25] On January 23, 2020, the juvenile court issued its findings, conclusions, and order, terminating Mother's parental rights to Child. *Appellant's App. Vol. II* at 5-24. The juvenile court specifically made the following conclusions:

> 6. There is no reasonable probability that the conditions that resulted in [Child's] removal from and continued placement outside the care and custody of [Parents] will be remedied.
>
> 7. The continued parental relationship between [Mother] and [Child] is a danger to [Child's] continued health and well-being.
>
> 8. Termination of the parent-child relationship between [Mother] and [Child] is in the best interests of [Child].
>
> 9. The plan of the [DCS] for the care and treatment of [Child], that being adoption of [Child], is acceptable and satisfactory.

*Id*. at 24. Mother now appeals.

# Discussion and Decision

## I.    Proper Findings

[26] Mother argues that the juvenile court erred in making its findings because the findings were improper. She essentially challenges the quality of the findings but makes no contention that the evidence presented at the termination hearing did not support the findings made by the juvenile court. Mother asserts that the juvenile court's findings were redundant and repetitive and that the record from

the CHINS case contained hearsay regarding the drug screens and other statements. She maintains that it was error for the juvenile court to rely on the record from the CHINS case due to this hearsay because Parents did not have the ability to cross-examine the people who performed the drug screens and the service providers whose statements appeared in the CHINS record.

[27] As to the redundancy and repetitiveness of the findings, we agree that the findings contained some repetition of evidence contained in the CHINS record, but Mother has not shown how this redundancy prejudiced her or affected the outcome of the termination case. Further, although she alleges in her argument about repetitiveness that the juvenile court apparently adopted the proposed findings submitted by DCS in the termination order, she does not point to evidence supporting this. Even if true, it appears that the repetitiveness of the findings actually came from the juvenile court's CHINS orders, which contained similar repeated information. *Ex. Vol.* at 12-33. Therefore, the duplicative language in the findings was not the product of any biased viewpoint of any party, and this court's discouragement for "wholesale adoption" of a party's proposed findings in *Redd v. Redd*, 901 N.E.2d 545, 549 (Ind. Ct. App. 2009) is not applicable here.

[28] Mother's argument regarding hearsay contained in the CHINS record, which the juvenile court took judicial notice of at the termination hearing, is a challenge to the juvenile court's CHINS orders. However, she failed to challenge the juvenile court's CHINS orders and the evidence contained within them during the CHINS case and has therefore waived such a challenge. The

failure to object to the admission of evidence at trial normally results in waiver and precludes appellate review. *In re Des.B.*, 2 N.E.3d 828, 834 (Ind. Ct. App. 2014). "In order to properly preserve an issue on appeal, a party must, at a minimum, 'show that it gave the trial court a bona fide opportunity to pass upon the merits of the claim before seeking an opinion on appeal.'" *In re Involuntary Termination of Parent-Child Relationship of B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (quoting *Cavens v. Zaberdac,* 849 N.E.2d 526, 533 (Ind. 2006)), *trans. denied*. Mother has, therefore, waived her challenge to the CHINS orders.

[29] Regarding Mother's challenge to the juvenile court taking judicial notice of the CHINS orders, the juvenile court was within its province to do so. Indiana Evidence Rule 201(b)(5) provides that a court may take judicial notice of the records of a court of this state. *See In re D.K.*, 968 N.E.2d 792, 796 (Ind. Ct. App. 2012) (upholding the trial court's judicial notice of the records of a related CHINS proceeding at the outset of a hearing to terminate parental rights). Therefore, the juvenile court's judicial notice of the underlying CHINS records was proper. Additionally, Mother had the opportunity to specifically contest any facts or information contained within the CHINS records and did not do so. Further, the findings that Mother finds objectionable were also testified to by witnesses during the termination hearing, and no objections were raised to the evidence at that time. Her contentions are therefore waived. *See In re Des.B.*, 2 N.E.3d at 834. We do not find that the juvenile court erred in making its findings.

# II.   Sufficient Evidence

[30]   As our Supreme Court has observed, "Decisions to terminate parental rights are among the most difficult our trial courts are called upon to make.  They are also among the most fact-sensitive -- so we review them with great deference to the trial courts[.]"  *E.M. v. Ind. Dep't of Child Servs.*, 4 N.E.3d 636, 640 (Ind. 2014). While the Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise her child and parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet her responsibility as a parent.  *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005); *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*.  Parental rights are not absolute and must be subordinated to the child's interests in determining the appropriate disposition of a petition to terminate the parent-child relationship.  *In re J.C.*, 994 N.E.2d 278, 283 (Ind. Ct. App. 2013).  The purpose of terminating parental rights is not to punish the parent but to protect the child.  *In re D.P.*, 994 N.E.2d 1228, 1231 (Ind. Ct. App. 2013).  Termination of parental rights is proper where the child's emotional and physical development is threatened.  *Id*.  The juvenile court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship.  *Id*.

[31]   When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses.  *In re H.L.*, 915 N.E.2d 145,

149 (Ind. Ct. App. 2009). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id*. Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the juvenile court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Id*. at 148-49. A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *In re S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004).

[32] Where, as here, the juvenile court entered specific findings and conclusions, we apply a two-tiered standard of review. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied*. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id*. A finding is clearly erroneous only when the record contains no facts or inferences drawn therefrom that support it. *Id*. If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.*

[33] Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases is one of clear and convincing evidence. *In re H.L.*, 915 N.E.2d at 149. Moreover, "if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship." Ind. Code § 31-35-2-8(a) (emphasis added).

[34] Mother argues that the juvenile court failed to prove by clear and convincing evidence that her parental rights should be terminated and asserts that the evidence was insufficient to support the juvenile court's determinations. Mother specifically contends that DCS failed to prove that the conditions resulting in the removal of Child would not be remedied and that continuation of the parent-child relationship posed a threat to the well-being of Child. She asserts that DCS failed to prove that there was no showing of any nexus between her drug use and the grounds upon which her parental rights were terminated and that her drug use alone does not establish a proper basis for termination of her parental rights. Mother further maintains that there was no

evidence that the domestic violence between Parents affected Child because there was no testimony that domestic violence occurred in the presence of Child or that Child was able to comprehend the domestic violence since Child was only a few months old when removed from Parents' care.

[35] In determining whether there is a reasonable probability that the conditions that led to a child's removal and continued placement outside the home will not be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, we must ascertain what conditions led to the child's placement and retention in foster care, and, second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *E.M.*, 4 N.E.3d at 643 (quoting *K.T.K.*, 989 N.E.2d at 1231). Pursuant to this rule, "trial courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." *In re D.B.*, 942 N.E.2d 867, 873 (Ind. Ct. App. 2011). In addition, DCS need not provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Involuntary Termination of Parent-Child Relationship of Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

"We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *E.M.,* 4 N.E.3d at 643. When determining whether the conditions for the removal would be remedied, the juvenile court may consider the parent's response to the offers of help. *D.B.,* 942 N.E.2d at 873.

[36] Here, the conditions that led to Child's removal were Parents' substance abuse and domestic violence. *Tr.* at 15. As a result of the CHINS adjudication, Mother was ordered to obey the law, visit Child on a regular basis, maintain adequate housing and a means of legal income, abstain from drug use, participate in individual and family counseling and follow all recommendations, cooperate with home-based services, complete a drug and alcohol assessment and follow all recommendations, submit to random drug screens, complete parenting classes, attend AA/NA on a regular basis and secure a sponsor, complete an anger management assessment and follow all recommendations, maintain consistent contact with DCS and inform DCS of any change in address within forty-eight hours, participate in and successfully complete any recommendations of any domestic violence assessments or programs, and participate in a batterer's intervention program. *Ex. Vol.* at 34-37. The evidence presented at the termination hearing showed that Mother failed to accomplish many of these objectives.

[37] The evidence presented at the termination hearing showed that after completing a substance abuse assessment, Mother was diagnosed with "Cannabis Use Disorder, severe; GAD Generalized Anxiety Disorder and Panic Disorder" and

was referred to engage in individual counseling two to four times per month and also substance abuse treatment. *Appellant's App. Vol. II* at 8; *Ex. Vol.* at 12. Mother only "did a few" sessions of individual counseling, never did family counseling, did not engage in home-based services, saying it was because her mother would not let the service providers into the home. *Tr.* 58, 59, 62. Mother missed numerous random drug screens and tested positive for THC on every drug screen she took except for one. *Id.* at 62; *Ex. Vol.* at 12-13. She did not engage in parenting classes, did not attend AA/NA, secure a sponsor, and provide verification of attendance, and did not engage in a domestic violence assessment. *Tr.* at 62, 64, 65.

[38] The evidence showed that Mother's therapy sessions were closed out in December 2018 due to no shows, and after engaging in drug screens for a few months, her services for drug screening were closed out in April 2018. *Id.* at 20, 38. Her substance abuse sessions were also closed out for no-shows in April 2018. *Id.* at 20, 38, 49-50. Mother participated in supervised visitation with Child, but visitations were stopped in April 2018 when Parents kept moving and would try to make last minute arrangements, and did not answer the door on at least a couple of occasions when DCS arranged transportation for Parents to attend visitations. *Id.* at 20, 21-22. "[T]the failure to exercise the right to visit one's children demonstrates a 'lack of commitment to complete the actions necessary to preserve [the] parent-child relationship.'" *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007) (quoting *In re A.L.H.*, 774 N.E.2d 896, 900 (Ind. Ct. App. 2002)), *trans. denied*. Evidence was

also presented that even before supervised visitations were closed out, the visitations had to be ended a few times for safety reasons due to Mother fighting with Father. *Tr.* at 22.

[39] Mother seems to argue her substance use should be discounted or that DCS did not prove a nexus between her ability to parent and her drug use. However, she was diagnosed with "Cannabis Use Disorder, severe; GAD Generalized Anxiety Disorder and Panic Disorder," and she repeatedly had positive drug screens or missed drug screens throughout the duration of the case until services were terminated in April 2018. *Ex. Vol.* at 12-13. "[A] parent whose drug use led to a child's removal cannot be permitted to refuse to submit to drug testing, then later claim the DCS has failed to prove that the drug use has continued." *In re A.B.*, 924 N.E.2d 666, 671 (Ind. Ct. App. 2010). Mother's failure to show up for drug screens leads to the logical inference that she was continuing to use drugs. Child was born with THC in his system and experiencing symptoms of drug withdrawal, and for the duration of the case, Mother has not shown that she had ceased her drug use and completed services to ensure that she would be able to safely parent Child.

[40] At the termination hearing, FCM Maas testified that Parents' "major barriers for . . . reunification" were noncompliance with services and continued problems with domestic violence and drug use. *Tr.* at 22. She also testified that she had no proof that Parents had completed any services in Louisiana after they moved there without notifying DCS and after all services in Indiana had been terminated. *Id.* at 22. Parents failed to maintain contact with DCS despite

being ordered in the dispositional order to "maintain consistent contact with the DCS and inform DCS of any changes in address and phone number within [forty-eight] hours in writing." *Ex. Vol.* at 36. Mother also failed to consistently attend visitations with Child, even when she was still living in Indiana. *Tr.* at 21-22. Supervised visitations were suspended in April 2018 due to Parents not showing up, and at the time of the termination hearing in December 2019, Mother had not seen Child since she moved to Louisiana in June 2018. *Id.*; *Ex. Vol.* at 9.

[41] The evidence presented at the December 2019 termination hearing established that Mother had stopped participating in or failed to begin most services, including substance abuse and domestic violence intervention services, by April 2018 and then moved to Louisiana in June 2018 without informing DCS, failing to complete any services in the intervening year and a half until the termination hearing. "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *Lang*, 861 N.E.2d at 372. Also, as we have recognized, "[e]ven assuming that [the parent] will eventually develop into a suitable parent, we must ask how much longer [the child] should have to wait to enjoy the permanency that is essential to her development and overall well-being." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 375 (Ind. Ct. App. 2006), *trans. denied*. We, therefore, conclude that the juvenile court's conclusion that there was a reasonable probability Mother would not remedy

the conditions resulting in Child's continued removal from Mother's care was not clearly erroneous.[2]

[42] Based on the record before us, we cannot say that the juvenile court's termination of Mother's parental rights to Child was clearly erroneous. We, therefore, affirm the juvenile court's judgment.

[43] Affirmed.

Pyle, J., and Tavitas, J., concur.

---

[2] We need not address whether the juvenile court properly concluded that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to Child's well-being because Indiana Code section 31-35-2-4(b)(2)(B) is written such that, to properly effectuate the termination of parental rights, the juvenile court need only find that one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence. *See* Ind. Code § 31-35-2-4(b)(2)(B); *A.D.S. v. Ind. Dep't Child Servs.*, 987 N.E.2d 1150, 1157 n.6 (Ind. Ct. App. 2013), *trans. denied*.